E-FILED
Tuesday, 27 February, 2007  08:50:40 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| EDWIN C. DAVID and WESLEY E. DAVID, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-1234 |
| | ) | |
| JACK HAGEMAN, BRAD COLBROOK, | ) | |
| MICHAEL LUSTER, JAMES JACKSON, | ) | |
| MARK GLEASON, DICK HEISE, BRIAN HILE, | ) | |
| MARK LANDERS, JAKE KITNER, and | ) | |
| TROY BONNETT, | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

This matter is now before the Court on Defendants' Motions for Summary Judgment. For the reasons set forth below, Defendant Bonnett's Motion for Summary Judgment [#27] is GRANTED, and the Motion for Summary Judgment by Defendants Hageman, Colbrook, Luster, Jackson, Gleason, Heise, Hile, Landers and Kitner (the "State Defendants") [#37] is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The Central Illinois Enforcement Group ("CEIG") is a multi-jurisdictional narcotics unit that enforces laws against the sale and manufacture of illicit drugs and is comprised of law enforcement officers from police agencies that include the Illinois State Police, as well as county sheriffs' departments and local police departments.[1]  Defendant Jack

---

[1] The Court notes that in response to many statements of uncontested fact, Plaintiffs have responded that they "have insufficient knowledge of the allegations contained . . . And therefore deny same and demand strict proof thereof."  However, in responding to a summary judgment motion, this type of response is plainly insufficient and results in an

Hageman ("Hageman") is a Master Sergeant employed by the Illinois State Police who was assigned to the CEIG at the relevant time.  Also assigned to the CEIG from their positions with the Illinois State Police were Defendants Brad Colbrook ("Colbrook"), Michael Luster ("Luster"), and James Jackson ("Jackson").   Mark Gleason ("Gleason"), Dick Heise ("Heise"), Brian Hile ("Hile"), Mark Landers ("Landers"), and Jake Kitner ("Kitner") were assigned as Inspectors with the CIEG from their employment with the Leland Grove Police Department, Morgan County Sheriff's Department, Taylorville Police Department, Logan County Sheriff's Department, and Lincoln Police Department respectively. An Inspector with the CIEG has the powers possessed by sheriffs and law enforcement officers in cities of the State of Illinois, except that those powers can be exercised statewide when enforcing the duties conferred upon the Illinois State Police to regulate the production, sale, manufacture, possession, delivery, and distribution of controlled substances and cannibas.

On April 20, 2003, Jackson met with a confidential source who advised that William Bryles had recently completed a meth cook and was preparing to do another with James Bryles, Suzie Bryles, and Kenneth Teitsort ("Teitsort").  Jackson then drove the confidential source past the Bryles residence and conducted a brief surveillance of the Bryles' residence from the public roadways and thoroughfares.  Jackson had never met any of the Bryles or Teitsort.

---

admission of the fact.  *See* Local Rule 7.1(D)(2)(b)(2).  The mere denial of a particular fact without specific references to the affidavits, parts of the record, or other supporting materials is simply insufficient, and, "where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted." Trull v. Lason Systems, Inc., 982 F.Supp. 600, 601 (N.D.Ill. 1997), *citing* Flaherty v. Gas Research Inst., 31 F.3d 451, 453 (7th Cir. 1994).  Accordingly, where Plaintiffs have provided this type of response, the factual assertions in question will be treated as if they had been admitted.

On April 30, 2003, at 12:14 a.m., Hageman obtained a search warrant for the Bryles' residence and the person of William Bryles for the seizure of controlled substances and drug paraphernalia. The warrant further authorized the search of the persons of James Bryles and Suzie Bryles.

Prior to executing the warrant, the CIEG officers had a planning session in which a risk assessment was done that included obtaining criminal histories and other intelligence to determine the propensity for violence of the individuals that the officers believed would be present at the location, and an operation plan was developed. The officers were told that the Bryles had contact with law enforcement agencies in the past and had a tendency to be combative with the police, but there was no indication that the Bryles had previously committed crimes of violence. The equipment was checked and the officers were assigned to ride in certain vehicles to the Bryles' residence.

The officers then traveled to Goofy Ridge, Illinois, a remote rural area where the Bryles' residence was located. Plaintiffs, Edwin David ("Edwin David") and Wesley David ("Wesley"), live next door to the Bryles. The Davids' residence is located approximately 200 feet from the county road and approximately 200 feet from the Bryles' residence. Neither house is marked with a number or address on the structure. Although there was some sort of a poorly maintained hedge row between the houses, there were no signs or fences that separated/distinguished the two properties.

On the evening of April 29, 2003, the Davids built a bonfire in their yard between their property and the Bryles' residence. The flames of the bonfire were about two to four feet in the air. The Davids had been consuming alcoholic beverages in the afternoon and evening of April 29 and continued to do so into the early morning hours of April 30, 2003.

Suzie Bryles, one of the subjects of the warrant, had spent the evening with the Davids until she went to sleep in the Davids' house.

The officers pulled a van into David's driveway at approximately 12:45 a.m. on April 30, 2003, and another car driven by Hageman pulled in the Bryles' driveway. Jackson correctly identified the Bryles' residence for the other CIEG officers, who then exited the van and walked in the dark in a line via the driveway. As the officers went towards the Bryles' residence, they saw a bonfire and two white males standing at the fire. The fire raised some heightened concern for them because they had information that the Bryles had just completed a methamphetamine cook and it is customary for methamphetamine manufactures to burn their waste. The CIEG officers did not know the Davids or the Bryles, and the Davids have no evidence refuting the CIEG officers' claim that they initially thought that the Davids, who were standing around the bonfire, could have been the Bryles.

The CIEG officers were wearing gear that identified them as police officers. Five or six CIEG officers approached the men at the bonfire and surprised them. An officer ordered the Davids to get to the ground. Less than one minute elapsed from the time that the van carrying the CIEG officers arrived until the Davids were ordered to the ground. Wesley immediately complied, and no force was exerted against him. Although Edwin David was blinded by the lights on the van and petrified, he realized that armed officers were ordering him to the ground. However, he testified that he could not get to the ground fast enough.

Here, the versions of the facts drastically diverge. Defendants contend that when Edwin David did not immediately comply with the order to the ground, he was assisted to the ground with a straight arm to the chest area by Sergeant Colbrook, who then

proceeded to the Bryles residence.  After Edwin David was on the ground, Sergeant Luster approached, told him that someone would be with him soon, and made sure another officer was with him before proceeding to help secure the Bryles' residence.

According to Edwin David, "I'm trying to get down on the ground, and I couldn't get down quick enough, and they stomped me down and hurt my chest, and I raised up a little bit and they stomped me again."  While he cannot identify which officer did this, he has conceded that he had no contact with Defendants Gleason, Heise, Hile, Jackson, Kitner, and Landers.

The Davids were not handcuffed at any time, nor were their legs shackled.  They were not patted down or searched.  The Davids remained on the ground for approximately 10-20 minutes while the Bryles' residence was being secured.  While on the ground, they were asked to identification from one officer and were allowed to obtain the information from their wallets to give to the officer.  Once the Davids were identified, they were allowed to get up.  Their drivers' licenses were returned to them, and they were free to move about. No CIEG officers entered the Davids' house on April 30, 2003.  There was no indication that the bonfire was used in the disposal of methamphetamine, and no additional warrants were obtained to search the bonfire area.

On May 2, 2005, the Davids brought this action under 42 U.S.C. § 1983 alleging damages from the unlawful search upon their land and the unlawful use of force against them during the execution of the search warrant.  Defendants have moved for summary judgment, and this Order follows.

**STANDARD OF REVIEW**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**ANALYSIS**

I.      Unreasonable Seizure

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  In a § 1983 action against a police officer for unreasonable seizure, a plaintiff must establish: (1) that he was seized, and (2) that the seizure was unreasonable.  Lunini v. Grayeb, 184 Fed.Appx. 559, 562 (7th Cir. 2006), *citing* Saucier v. Katz, 533 U.S. 194, 201 (2001); White v. City of Markham, 310 F.3d 989, 993 (7th Cir. 2002).  Here, it is undisputed that the CIEG officers came the residence pursuant to a valid search warrant for the Bryles' residence, as well as the persons of the Bryles, and that the Davids were "seized" within the meaning of the Fourth Amendment.  The question then becomes whether it was reasonable for the officers to detain them.

"The reasonableness of a seizure is determined by weighing an 'individual's privacy interests against legitimate government interests' in view of the totality of the circumstances."  Lunini, 184 Fed.Appx. at 562, *citing* White, 310 F.3d at 995.  It is well-settled that the execution of narcotics warrants produces peculiar threats:

> The dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers.

Baker v. Monroe Township, 50 F.3d 1186, 1191 (3rd Cir. 1995), *relying on* Michigan v. Summers, 452 U.S. 692 (1981).  The need to determine the identity of persons in the immediate area of the place to be searched, to protect them from gunfire, and to clear the way for the police to operate efficiently in executing the search warrant all contribute to the reasonableness of a decision to get these persons down to the ground for a brief period of time.  Id.  The government also has a legitimate and important interest in discovering

- 7 -

criminal conduct and preventing the sudden eruption of violence, destruction of evidence, or flight of suspects.  <u>Summers</u>, 452 U.S. at 702.

> [O]fficers executing a narcotics search warrant need not confine their attention to the area contained by the walls of the building they are authorized to search.  The may detain - briefly, and with no more than reasonable force - those whose presence adjacent to the scene of a search poses a potential significant risk to the officers or to the persons detained.  They may detain persons who might be occupants, and if the premises have a history of people coming and going frequently, those who might be customers or suppliers.  People who draw near a place where a narcotics search warrant is in the beginning stages of execution are, at best, in danger and, at worst, may be threats themselves or confederates of those operating from the place to be searched.

<u>United States v. Jennings</u>, 2006 WL 2682383, at *5 (N.D.Ind. Sept. 15, 2006).

The record reveals that the bonfire was situated between the Bryles' residence and the Davids' residence, which were 100-200 feet apart.  Although there was some thin brush or hedge between the houses, it was scattered to the point that people could walk through it where plants had died out.  There were no fences separating the property or signs distinguishing the property lines.  The Davids argue that the officers should have been able to discern property lines based on the fact that their lawn was mowed and the Bryles' lawn was not, but there is nothing in the record indicating that this alleged difference was visible in the dark.  Additionally, neither the Davids nor the Bryles were personally known to the CIEG officers conducting the search.

The record is likewise devoid of evidence indicating that the Davids' property was searched.  The quick visual check to determine that evidence was not being destroyed in the bonfire in the course of crossing the property to get to the Bryles' residence does not rise to the level of a constitutional violation.  <u>United States v. Tolar</u>, 268 F.3d 530, 532 (7th

Cir. 2001).  Moreover, the indication that the bonfire could have been being used to destroy evidence subject to the search warrant gave rise to exigent circumstances reasonably permitting a warrantless entry onto what is now known to be the Davids' property to verify that destruction of evidence was not taking place.  United States v. Marshall, 157 F.3d 477, 481-82 (7th Cir. 1988); Leaf v. Shelnutt, 400 F.3d 1070, 1081 (7th Cir. 2005).

It is further undisputed that the CIEG officers did not enter the Davids' home, and the record is devoid of evidence suggesting that the brief detention and visual examination of the fire took place on the curtilage to the home.  The Davids conceded that the bonfire was 50-100 feet from their home, and there was nothing to protect the bonfire area from observation or prevent public accessibility.

Accordingly, on the record in this case, the Court concludes that the Defendants' conduct in approaching the two unknown men standing around the bonfire between the two houses and visually inspecting the contents of the bonfire was reasonable.  Based on the facts known to them at the time, Defendants had no reason to know that the Davids were not the Bryles in the process of destroying evidence of methamphetamine production. Therefore, the Davids' brief detention and the visual inspection of the bonfire area on the way to executing the search warrant on the Bryles' residence were reasonable and justified.

As such, the Davids' Fourth Amendment seizure claim is without merit, and Defendants are entitled to summary judgment.  As the Court has found that no reasonable jury could find in favor of the Davids on their unreasonable seizure claim, there is no need to address the remainder of any claim for qualified immunity.

II.      Excessive Force

- 9 -

When addressing an excessive force claim brought under §1983, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.  Graham v. Connor 490 U.S. 386, 394 (1989).  The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.

Where, as here, the excessive force claim arises in the context of the seizure of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." Id.   All claims that law enforcement officers have used excessive force in the course of an arrest or other "seizure" of a free citizen are analyzed under the Fourth Amendment and its objective "reasonableness" standard.  Id. at 395.  In other words, to properly state a fourth amendment excessive force claim, a plaintiff must establish that a seizure occurred and that the officer's use of force in effecting the seizure was unreasonable.  United States v. Hernandez, 1997 WL 80916, *3 (N.D. Ill. Feb. 21 1997).

The reasonableness of the officer's use of force is to be judged from the perspective of a reasonable officer on the scene at the moment that the force was used.  Graham, 490 U.S. at 396. Courts must consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 395; Lawrence v. Kenosha County, 391 F.3d 837, 843 (7th Cir. 2004).

- 10 -

Here, there is no question that a seizure occurred, because it is undisputed that the Davids were forced to the ground and detained for 10-15 minutes.  The question is whether the use of force was objectively reasonable under the circumstances.  Although Plaintiffs argue that the seizure was unnecessary because the Bryles were not believed to be dangerous and that the entry team used "stealth tactics" to approach the bonfire, the Court has already found the seizure to have been reasonable under the circumstances, and the only remaining portion to be addressed is the actual use of force employed in the seizure of Plaintiffs.

The record before the Court is simply devoid of evidence establishing that anyone used excessive force against Wesley.  To the contrary, the undisputed facts reveal that no force was used against Wesley, who voluntarily complied with the request and immediately dropped to the ground.  As the Court concludes that the force used in the brief detention of Wesley David was not excessive as a matter of law, Defendants are entitled to summary judgment on this claim, as well.

The excessive force claim brought by Edwin David is somewhat different.  Sergeant Colbrook has testified that he used a straight-arm maneuver to the chest area to get Edwin David to the ground when he did not immediately comply.  Sergeant Colbrook described this maneuver as a tactic that is not done with violent force, but is done as a nudge or soft push on the shoulder so that the individual can then lay himself down on his own free will.  (Colbrook Dep. at 31)   Sergeant Luster further stated that Edwin David may have attempted to get up, and when he did so, he touched the foot of Sergeant Luster.  However, Sergeant Luster testified that he applied no pressure, and there was no stomp or kick involved.   On the other hand, Edwin David testified that when he couldn't get down

quick enough, "they stomped me down and hurt my chest, and I raised up a little bit and they stomped me again." (E. David Dep. at 31) Although he cannot identify which officer did this, he testified that he believed it was the same person who stomped him down and put his foot in his back. Id.

Thus, there is clearly a dispute of material fact with respect to the amount of force used against Edwin David. As the Court cannot make determinations regarding credibility in resolving motions for summary judgment, Edwin David's excessive force claim must proceed to trial

That being said, there is then the question of which Defendants are involved with this claim. Liability under § 1983 requires direct, personal responsibility for the claimed deprivation of the constitutional right. Wolff-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). While direct participation by the defendant is not necessary, there must be a showing that: (1) the defendant failed to act or acted with deliberate indifference or a reckless disregard for plaintiff's constitutional rights, and (2) the conduct causing the constitutional deprivation occurred either at defendant's direction or with his knowledge or consent. Maltby v. Winston, 36 F.3d 548, 559 (7th Cir. 1994).

Sergeants Colbrook and Luster have admitted that they had physical contact with Edwin David during the detention. There is therefore no question that Sergeants Colbrook and Luster had personal involvement in the alleged use of force against Edwin David and will remain as Defendants in this case for trial.

With respect to the other Defendants, Plaintiffs have admitted that Defendants Gleason, Heise, Hile, Jackson, Kitner, and Landers had no contact with the Plaintiffs whatsoever. Similarly, the record reflects that Officer Bonnet was assigned to the front

perimeter.   Accordingly, the record is devoid of evidence of the requisite personal involvement, direction of the conduct that caused the alleged deprivation, or knowledge/ consent by these Defendants, and no reasonable jury could find in favor of Edwin David with respect to his claim against Defendants Gleason, Heise, Hile, Jackson, Kitner, and Landers.   Summary judgment is therefore granted in favor of these Defendants, and Defendants Gleason, Heise, Hile, Jackson, Kitner, and Landers are terminated as parties to this litigation.

Master Sergeant Hageman was involved in the search in a supervisory capacity. In order to state a claim against a supervisory official for the conduct of his supordinates, a plaintiff must show that he "knowingly, willingly, or at least recklessly caused the alleged deprivation by his action or failure to act." Rascon v. Hardiman, 803 F.3d 269, 274 (7th Cir. 1986).   In other words, the supervisor must have "known about the alleged conduct, facilitated it, approved it, condoned it, or purposefully turned a blind eye to it for fear of what they might see." Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988).

In this respect, the record contains testimony by Master Sergeant Hageman that there was thin brush between himself and the bonfire when he entered the Bryles' driveway, and he could see silhouettes of individuals standing around the bonfire. (Hageman Dep. at 38) The bonfire concerned Master Sergeant Hageman, because he had information that the Bryles had just completed a methamphetamine cook and, in rural areas, it is customary for manufacturers to burn their waste. Id., at 41.  He watched the entry team exit the vehicle and head towards the bonfire. Id., at 42.  The record is devoid of evidence indicating what Master Sergeant Hageman did next; there is nothing indicating whether he followed the officers back to the bonfire area and continued to observe them

- 13 -

as they approached the Plaintiffs or whether he continued on with the other officers to the Bryles' residence.  There is simply no evidence indicating that he observed the alleged stomping or that the fact that excessive force was being used was communicated to him in any way.

Thus, Plaintiffs have cited no evidence from which a reasonable jury could conclude that Master Sergeant Hageman either knew about, facilitated, approved, condoned, had the opportunity to stop, recklessly disregarded, or turned a blind eye to the purported use of excessive force against Edwin David.  Master Sergeant Hageman is therefore entitled to summary judgment on the excessive force claim and is also terminated as a party defendant in this action.

That leaves Deputy Bonnett, a deputy with the Mason County Sheriff's Office who was not part of the task force but was assigned to provide a uniformed police presence during the search and guard the perimeter.  He was not part of the entry team and arrived separately at the scene in his marked squad car.  Upon arrival, Deputy Bonnett got out of his squad car but hung back and did not follow behind the entry team.  He did not see the entry team approach the bonfire or secure the Plaintiffs.  In fact, by the time Deputy Bonnett came around the house and approached the bonfire, Plaintiffs were already on the ground.  It is undisputed that he had no physical contact with either Wesley or Edwin David, and Edwin David has stated that the first time he saw Deputy Bonnett was when he was released to get up from the ground.  Once Deputy Bonnett reached the bonfire and saw the Plaintiffs, he informed the other officers that Plaintiffs were not the Bryles, and they were asked for their identification.

- 14 -

Plaintiffs have pointed to nothing in the record indicating that Deputy Bonnett observed or had reason to know of the alleged use of excessive force against Edwin David. To the contrary, the record reveals that he did not come around the corner toward the bonfire until after Plaintiffs were already on the ground and secured.  Accordingly, Plaintiffs have failed to meet their burden of showing that Deputy Bonnett failed to act or acted with deliberate indifference or a reckless disregard for their constitutional rights, or that the conduct causing the constitutional deprivation occurred either at his direction or with his knowledge or consent.  Deputy Bonnett is therefore entitled to summary judgment on this claim, as well.

## CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment [#37] by the State Defendants is GRANTED IN PART and DENIED IN PART, and the Motion for Summary Judgment [#27] by Defendant Bonnett is GRANTED.  Summary judgment is granted in favor of all Defendants on Plaintiffs' unreasonable seizure claim and Plaintiff Wesley David's excessive use of force claim.  Summary judgment is also granted in favor of Defendants Hageman, Jackson, Gleason, Heise, Hile, Landers, Kitner, and Bonnett on Edwin David's excessive force claim; summary judgment is denied with respect to the excessive force claim of Edwin David against Defendants Colbrook and Luster. Defendants Hageman, Jackson, Gleason, Heise, Hile, Landers, Kitner, and Bonnett are terminated as parties to this litigation, and the remaining claim against Defendants Colbrook and Luster is now ready for final pretrial conference, which remains set for Friday, April 27, 2007.

ENTERED this 27th day of February, 2007.

- 15 -

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge